# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 10, 2009

## TIMOTHY HUTSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-02606     Carolyn Wade Blackett, Judge**

---

**No. W2009-00680-CCA-R3-PC  -  Filed May 17, 2010**

---

In June 2005, a Shelby County jury convicted the petitioner, Timothy Hutson, of first degree murder, and he received a life sentence. The petitioner filed for post-conviction relief, arguing that his trial counsel provided ineffective assistance. Specifically, the petitioner alleges that trial counsel failed to provide timely information about a plea agreement, failed to develop a working relationship with the petitioner, and advised the petitioner to wear jail clothes rather than civilian clothes during the trial. The post-conviction court denied relief. Following our review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Vanessa Cross, Memphis, Tennessee, for the appellant, Timothy Hutson.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Carrie Shelton and Brooks Yelverton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

In April 2005, a Shelby County grand jury indicted the petitioner for first degree murder. The matter went to trial in June 2005. The following is a summary of the trial testimony taken from this court's opinion on direct appeal.

> This case concerns the killing of Lisa Hudspeth on January 18, 2003, in Shelby County. The victim was shot at close range in the head with a high

velocity rifle while in the front yard of a residence occupied by Jimmy Smith. The facts surrounding the shooting were supplied at trial by witnesses present at the scene and a neighbor who was the only individual who witnessed the actual shooting.

Charles Stidmon, an Oklahoma resident, was staying at the Smith house on January 18. He testified that the victim was his girlfriend and was planning to return with him to Oklahoma that day. He stated that the [petitioner] and the victim came to the Smith residence early that morning after being at the casinos the night before. The [petitioner] accused the victim of taking his cell phone and some rock cocaine, which the victim denied. Stidmon heard a gunshot while he was in the bathroom. He looked outside and saw the victim lying in the yard and the [petitioner] leaving the scene in his truck.

Jimmy Smith testified that the [petitioner]'s and victim's return from the casinos woke him about 7:30 on January 18. He did not recall any conversation that took place. He stated that the [petitioner] left after approximately thirty minutes. Smith was outside when the [petitioner] returned and pulled his truck into the yard. Smith was occupied with jump-starting his vehicle and did not witness the shooting.

Tracy Green was also a guest at the Smith house on January 18. He heard the [petitioner] accuse the victim of taking his cell phone. Green said the [petitioner] seemed to be mad as he left the residence. When the [petitioner] returned, Green was assisting Smith in starting his vehicle. He heard the gunshot and saw the victim drop to the ground. The [petitioner] then placed a long weapon in the back of his truck, kicked the victim's body, and remarked that she was dead before leaving in his truck.

Eric Wallace witnessed the events from outside his house, which is directly across the street from Smith's residence. Wallace knew the victim and the [petitioner] from seeing them in the neighborhood. On the morning of January 18, Wallace had seen the [petitioner]'s silver Dodge truck coming and going from the Smith residence. The [petitioner] returned to Smith's about 9:00 a.m. and pulled his truck into the yard. The [petitioner] unloaded two puppies and turned them loose. He then walked to the front door and yelled inside. The [petitioner] returned to his truck and took a long object from behind the seat. The [petitioner] sat in the driver's seat with his leg propping the door open. The victim came out of the house and approached the [petitioner]. Wallace saw the [petitioner] aim directly at the victim's head and

fire the weapon. The victim fell to the ground within the span of the [petitioner]'s open truck door. The [petitioner] "nonchalantly" kicked the victim's body twice and then backed the truck up approximately fifty feet. The [petitioner] then got out and looked at the victim's body once more before driving away from the scene.

Scott Brown, a detective with the Horn Lake, Mississippi Police Department related that the [petitioner] had made a complaint to his office on January 15, 2003. The [petitioner] reported a theft of his debit card and named the victim as a suspect. The [petitioner] furnished a picture of the victim and a printed form of activity concerning the debit card. Detective Brown initiated an investigation but closed the case upon learning of the victim's death.

Sergeant Scott Evans of the Horn Lake Police Department participated in a search of the [petitioner]'s residence and vehicle on January 18. Sergeant Evans described finding blood, brain matter, and hair on the inside and outside of the [petitioner]'s truck. A rifle was found resting on a gun rack inside the [petitioner]'s residence.

Agent Steve Scott of the Tennessee Bureau of Investigation testified as an expert in firearms identification. He tested the rifle seized from the [petitioner] and found it to be in proper operating condition with all safety features intact. Agent Scott described the weapon as a Ruger high velocity hunting rifle.

Dr. O.C. Smith, an expert in forensic pathology, testified that the autopsy revealed the victim's cause of death was a high velocity gunshot wound to the head. He also explained that high velocity wounds can result in a cavitation effect, causing tissues to be propelled away at a considerable distance.

The [petitioner], after voir dire, opted to remain silent. No defense proof was presented. The jury returned a verdict of guilt as to first degree premeditated murder.

*State v. Timothy Hutson*, No. W2005-01812-CCA-R3-CD, 2006 WL 3147052, *1-2 (Tenn. Crim. App., at Jackson, Nov. 3, 2006) (no application for permission to appeal filed). This court found that the evidence supported the jury's verdict and affirmed the defendant's conviction. *Id.*, at *3.

The petitioner, *pro se*, filed his first petition for post-conviction relief on October 3, 2007.[1]  Through counsel, he filed an amended petition on May 21, 2008.  The post-conviction court heard the petition on January 7 and 23, 2009, and the parties presented the following testimony.

Yvonne Savage testified that she was the petitioner's ex-wife.  She was present during all three days of his trial.  Ms. Savage testified that William Moore,[2] of the public defender's office, represented the petitioner for two years.  Mr. Moore passed away six weeks before the trial began, at which time trial counsel replaced him.  She spoke with trial counsel over the phone at least twice and during breaks in the trial.  She asked trial counsel whether she should bring civilian clothes for the petitioner to wear during trial, but he told her that petitioner would not be able to change clothes.  As a result, the petitioner appeared at trial in his jail clothes, an orange jumpsuit.  Ms. Savage said that the petitioner appeared disoriented during the trial.  Ms. Savage also spoke with trial counsel about hearing aids for the petitioner.  Her daughter bought one hearing aid for him, and trial counsel asked her to raise $1,500 to purchase a second hearing aid.  The petitioner, however, told Ms. Savage not to give money to trial counsel for a hearing aid because the county would pay for it.  Ms. Savage testified that trial counsel did not seem prepared at trial because he did not cross-examine many witnesses or have many questions.  When trial counsel informed her that the petitioner decided not to testify, she was very surprised because the petitioner had repeatedly told her that he would testify.

On cross-examination, Ms. Savage admitted that trial counsel did not discuss trial strategy with her.  She was not aware that trial counsel paid for the petitioner's second hearing aid "out of his own pocket."  She further testified that she agreed with the petitioner's decision not to testify because she was afraid that he would appear disoriented on the witness stand.

The petitioner testified that Mr. Moore represented him for two years until his death in January 2005.  During that time, the petitioner was under indictment for second degree murder.  In April 2005, the grand jury re-indicted the petitioner for first degree murder.  The petitioner learned that trial counsel would represent him on the same day that he learned about the re-indictment.  The petitioner estimated that there were thirty business days

---

[1] In his first petition, the petitioner alleged, *inter alia*, that his appellate counsel was ineffective for failing to file an application for permission to appeal to the supreme court and for not notifying the petitioner of his right to proceed *pro se*.  The petitioner waived his right to apply for permission for a delayed appeal at a hearing before the post-conviction court on March 19, 2008.  Thereafter, the petitioner proceeded solely on a theory that his trial counsel was ineffective.

[2] Ms. Savage could not remember Mr. Moore's first name, but other witnesses testified that his full name was William Moore.

between the day he learned that trial counsel would represent him and the first day of his trial on June 6, 2005. The petitioner met with trial counsel in the courtroom during four or five report days. The first time that trial counsel came to the jail to see him was June 7, 2005, and they met for approximately thirty minutes. The petitioner asked trial counsel about arranging for his family to bring him civilian clothes to wear during trial. According to the petitioner, trial counsel told him that he did not need civilian clothes because the jury would not believe that he was out on bond.

The petitioner testified that Mr. Moore developed an accidental shooting theory and had secured a blood spatter expert who would testify for the defense. The petitioner did not know what strategy trial counsel had developed for his defense. Trial counsel did not present any witnesses at trial. According to the petitioner, trial counsel told him that if he testified, he would have difficulty explaining how the gun was loaded after he checked that it was unloaded. The petitioner planned to testify on his own behalf until after the state finished its proof, at which time trial counsel told him he did not have to testify. Trial counsel did not allow him to discuss with his family whether he should testify, but counsel talked to his family for him. They left the decision to the petitioner, and he decided not to testify. During his voir dire about his decision not to testify, the trial judge informed him that without his testimony, there would be no evidence that he was intoxicated at the time of the shooting, but the petitioner did not understand what the judge meant. He never discussed intoxication with trial counsel, but the police report included his statement that he was intoxicated at the time of the shooting. He reasoned that if counsel had read the police report, then he would have known that the petitioner had been intoxicated. The petitioner said that counsel "knew that [he] was real [sic] intoxicated."

The petitioner testified that trial counsel told him in April 2005, on the day that the petitioner learned about the re-indictment, that the state offered him a plea deal of thirteen and one-half years. The petitioner asked trial counsel whether he would have to serve 100 percent of the sentence and said he did not want to take the deal if he had to serve 100 percent. Trial counsel told him that he would have to serve 100 percent, but he promised to confirm that with the state. During trial, counsel assured the petitioner that he would serve 100 percent under the state's plea offer.

The petitioner testified that trial counsel did not let him see photographs of the crime scene. He explained that Mr. Moore had given him photographs, but they were too dark to see what was in the photographs. The petitioner wanted trial counsel to show the jury pictures of tire tracks that he claimed showed how he was careful to drive around the victim's body. The petitioner said that trial counsel did not tell him what length of sentence he could expect. Concerning his hearing aid, the petitioner said that the Board of Professional Responsibility showed him a copy of the check written by trial counsel to pay for the hearing aid after the petitioner brought a claim against trial counsel.

On cross-examination, the petitioner explained that his family hired an attorney who represented him in general sessions court, but the court appointed the public defender's office after the petitioner and his family could no longer afford an attorney. The petitioner said that Mr. Moore used an investigator, obtained statements from all but one of the witnesses, and talked to a blood spatter expert, but trial counsel did not do any of those things. The petitioner said that he understood that trial counsel inherited Mr. Moore's files because they both worked for the public defender's office, but he did not know that trial counsel had access to everything Mr. Moore did. The petitioner acknowledged that trial counsel argued during trial that the shooting was accidental, which was in accord with the petitioner's version of the shooting.

On re-direct examination, the petitioner testified that trial counsel told the jury in his opening statement that they would hear evidence of an accidental shooting and the petitioner's testimony. The petitioner said that the only evidence that trial counsel presented of an accidental shooting was one witness's testimony on cross-examination that the victim leaned into the petitioner's truck. According to the petitioner, another public defender, who was assisting trial counsel, told him that the state's prosecutor was very good and might "make [him] say something [he did not] want to say."

Trial counsel testified that he had worked for the public defender's office since 2003, and he worked in private practice, with a focus on criminal defense, for eleven years prior to joining the public defender's office. When William Moore passed away, the office assigned his entire case load to trial counsel, and he began working on those cases in March 2005. He did not have an opportunity to speak with Mr. Moore about his cases. Counsel took a couple of weeks to acquaint himself with all of the cases and focused on those that would go to trial soon, including the petitioner's case. The petitioner's case file included his initial intake interview, full discovery, notes from the blood spatter expert, and interviews with all but one witness, who was not on the witness list. Counsel interviewed the remaining witness, Mr. Stidmon, before trial. He also familiarized himself with the forensic "lingo," learned how much cocaine the victim had ingested, and spoke with a weapons expert about the gun used by the petitioner. He did not ask for a continuance because the court had continued the case once, and the petitioner was "quite anxious to get to trial."

Trial counsel said that the grand jury originally indicted the petitioner for second degree murder. On March 16, 2005, counsel learned of the thirteen and one-half-year plea deal from the prosecutor, who warned counsel that the state would seek to re-indict the petitioner for first degree murder if the petitioner did not accept the plea offer. Trial counsel conveyed the offer to the petitioner the same day, but he rejected it. Counsel testified that the plea offer was available throughout the pre-trial process, and the petitioner asked at an interim report date whether the offer was for a lower release eligibility percentage. Counsel told the petitioner that he did not think so, but he would ask the state.

Counsel first interviewed the petitioner on March 16, 2005. They "went through his story" and discussed how it was different than the statement that he gave police. The petitioner "was adamant that he was not intoxicated." The grand jury re-indicted the petitioner for first degree murder on April 21, 2005. Trial counsel agreed that Mr. Moore prepared the case file in anticipation of a second degree murder trial, but counsel said he would not have prepared differently for a first degree murder trial because the accidental shooting theory remained the same. Trial counsel testified that he went through most of the photographs with the petitioner, with the exception of the blood spatter photographs. Trial counsel said the petitioner was very helpful in preparing the accidental shooting theory. He agreed that he promised the jury in his opening statement that the petitioner would testify, and he said the petitioner wanted to testify. He further agreed that his trial assistant spoke with the petitioner about how the state would cross-examine him, but counsel said the assistant was merely telling him what to expect when he testified. Trial counsel said he met with the petitioner the night before he was supposed to testify, and the petitioner said that his family did not want him to testify. When counsel spoke with the family, the petitioner's daughter said she was concerned that he would get confused on the stand. Trial counsel agreed that, prior to the state's voir dire, the petitioner did not realize that his testimony would be the only proof that he was intoxicated at the time of the shooting, but counsel said that the petitioner would not have testified that he was intoxicated.

Trial counsel denied telling Ms. Savage that the petitioner did not have a right to wear civilian clothes at trial. He said that after conferring with the petitioner and with his colleagues, he decided that having the petitioner appear in jail clothes would evoke the jury's sympathy for the petitioner because of his age and poor health. He admitted that he told the petitioner that the jury would not believe that he was out on bond. The petitioner agreed to wear jail clothes and "was very accommodating."

Trial counsel said the only time he met with the petitioner in jail was the night before the petitioner was supposed to testify. He had unsuccessfully tried to meet with him at the jail prior to that day, so he set the interim report dates to give them a chance to meet. He estimated that he spoke to the petitioner "a little more than" two hours, and they went over the petitioner's story each time they met. Counsel said that much of the week prior to trial was spent "trying to keep from continuing the case again because of a hearing aid."

Trial counsel testified that he spoke with the blood spatter expert by phone prior to trial, and she was prepared to testify for the petitioner. Counsel issued a subpoena for her testimony. He did not call the blood spatter expert to the stand after the petitioner decided not to testify because "the last thing [he would do] is bring out more brain matter and pictures . . . and make that [his] only proof . . . ."

Counsel said that the petitioner was angry when the jury found him guilty, specifically because counsel was unable to make the witnesses admit they were lying. The petitioner said that when he got a new trial, he would get a different attorney. Trial counsel testified that he was prepared for the trial, saying, "I believed in him. I lived that man's case for a little over a month. That's just about all I did . . . . I will not ever say that I was not prepared for that trial."

On cross-examination, trial counsel testified that the petitioner told him that he had one "hitter" of cocaine at the casinos the night before the shooting, but the petitioner told police that he had been drinking and using cocaine all night. Trial counsel said he paid $2,495 for a hearing aid for the petitioner after the state refused to pay for one and the petitioner's family did not have the money. He testified that the petitioner knew that he might receive a life sentence after he was indicted for first degree murder.

On re-direct examination, trial counsel said that the petitioner did not ask him about wearing civilian clothes at trial; instead, trial counsel first mentioned his strategy of wearing jail clothes, and the petitioner said he trusted counsel's judgment. Counsel testified that he had adequate time to prepare for trial because Mr. Moore had already done much of the work, such as obtaining witness interviews and discovery.

On March 11, 2009, the post-conviction court filed a written order denying post-conviction relief. The court found that the petitioner did not prove the factual allegations of his petition for post-conviction relief by clear and convincing evidence. The petitioner filed this timely appeal.

**Analysis**

The petitioner contends that trial counsel provided ineffective assistance. Specifically, the petitioner claims that trial counsel did not provide enough information about the state's plea offer because he did not tell him prior to trial that the offer would require him to serve 100 percent of thirteen and one-half years. The petitioner further claims that trial counsel failed to develop a working relationship with him because he only met the petitioner at the jail once and did not convey his trial strategy. As part of this claim, the petitioner alleges that trial counsel did not follow through with his promise to the jury that they would hear proof of an accidental shooting and the defendant's testimony. Finally, the petitioner argues that trial counsel advised him that he did not have the right to appear before the court in civilian clothes.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's

findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is *de novo* with a presumption that the findings are correct. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Id.*

To establish ineffective assistance of counsel, the petitioner must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.* at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Also, a fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. However, deference is given to strategy and tactical decisions only if the decisions are informed ones based upon adequate preparation. *Id.* (citations omitted).

First, the petitioner claims that counsel did not provide him with enough information about the state's plea offer for him to make an informed decision. At the post-conviction hearing, trial counsel testified that he informed the petitioner on the same day he learned of the plea offer that the petitioner would have to serve 100 percent of the state's offer of thirteen and one-half years. The petitioner testified that he told trial counsel that he did not want to accept the plea offer if he had to serve 100 percent. The post-conviction court denied relief on this issue because the petitioner did not offer proof that he would not have served 100 percent under the state's plea agreement. We conclude that the evidence does not preponderate against the post-conviction court's findings. The petitioner has not carried his burden of proving that trial counsel was ineffective in communicating the state's plea offer; therefore, the petitioner is without relief as to this issue.

Secondly, the petitioner claims that trial counsel failed to develop a working relationship with him. The post-conviction court concluded that the petitioner's right to effective assistance of counsel does not include having a meaningful relationship and that the petitioner did not show that counsel's performance was deficient. We agree. "The right of an accused to assistance of counsel . . . does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000). Trial counsel testified that he met with the petitioner once at the jail and numerous times at the courthouse, and he said the petitioner was very helpful in preparing his accidental shooting defense. Also, counsel said they went over the petitioner's story many times, he did research to understand the case better, and he spent $2,495 of his own money to purchase a hearing aid for the petitioner. We conclude that the petitioner has not shown that counsel was deficient in his relationship with the petitioner; therefore, the petitioner is not entitled to relief on this issue.

The petitioner further argues that counsel was ineffective because he did not follow through on promises he made to the jury in his opening statement. However, this is the first time that the petitioner has raised this issue as he did not include it in his petition for post-conviction relief. Because the issue is raised for the first time on appeal, it is waived. *See Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996); Tenn. Code Ann. §40-30-110(f); *see also Bobby Blackmon v. State*, No. M2004-03070-CCA-R3-PC, 2007 WL 92361, *6 (Tenn. Crim. App., at Nashville, Jan. 11, 2007). Additionally, a petitioner cannot change theories from the trial court to the appellate court. *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001); *State v. Dooley*, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000); *see also State v. Barbara Ann Bryant*, No. W2007-00287-CCA-R3-PC, 2008 WL 1850914, *3 (Tenn. Crim. App., at Jackson, April 23, 2008). The petitioner is not entitled to relief on this issue.

Finally, the petitioner claims that trial counsel was deficient because he advised the petitioner that he did not have the right to wear civilian clothes at trial. The post-conviction court found that the petitioner failed to show he was forced to wear jail clothes and failed to prove that trial counsel's strategy of having the petitioner wear jail clothes to elicit sympathy from the jury was below an objective standard of reasonableness. The fact that a particular strategy failed does not by itself establish ineffective assistance of counsel, and deference is made for sound trial strategy if the choices are informed and based upon adequate preparation. *Goad*, 938 S.W.2d at 369. Trial counsel testified that he consulted the petitioner about his strategy, and the petitioner agreed to follow his advice. Additionally, trial counsel testified that he consulted with his colleagues about his strategy. We conclude that the evidence does not preponderate against the post-conviction court's findings. Therefore, the petitioner is without relief on this issue.

**Conclusion**

Based on the foregoing reasons, we affirm the denial of post-conviction relief.


_____
J.C. McLIN, JUDGE